UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-20335-Cr-Ruiz

UNITED STATES OF AMERICA

v.

GLEB KLIONER

_____/

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States submits the foregoing sentencing memorandum.   This memorandum is organized as follows.   Section I contains the relevant factual background.   Section II outlines the Probation Office's recommended guideline calculations, as well as the issues pending before the Court to reach a final advisory guideline offense level and sentencing range.   Section III explains why the Court should impose a sentence within the advisory guideline range.

**I.      FACTUAL BACKGROUND**

*A.      Sale of St. Regis Unit 502S*

The victims in this case are Kirill Stadnikov and Tatiana Zorina.   A Russian national and a metals engineer by training, Mr. Standikov formed Heli-Sky around 2006 or 2007.   Heli-Sky is an aviation services company that assists nations and international organizations operating in Asia and Africa.   Entities Heli-Sky have aided have included U.S. and Allied forces operating in Afghanistan, as well as United Nations and similar organizations that provide food and relief services – oftentimes in remote and hazardous locations.   *See* ECF 141, pp. 60-67.

Using proceeds from their business, in approximately 2013 the victims purchased Unit 502S at the St. Regis Bal Harbour.   Shortly after buying the unit, the victims met the defendant,

who was a longtime realtor in the Miami Beach area.   For a number of years, they employed the defendant as a sort of property manager for the unit, which is a role the defendant frequently performed for his Russian clients.   When the victims bought a second condominium in Bal Harbour in early 2017, the defendant served as their realtor and, thereafter, also in the same property manager role as with the unit at the St. Regis.   *See* ECF 139, pp. 155-58; ECF 140, p. 191; ECF 141, pp. 67-74; *Gov't Exh. 15.*

In the late 2010s, the victims put Unit 502S up for sale and contracted with the defendant to represent them as their realtor.   After several years, the defendant secured a buyer, at a price of $4,200,000.   The parties went under contract on February 8, 2021, and the sale closed on March 10, 2021.   *See* ECF 139, pp. 41-54; ECF 141, pp. 76-79; *Gov't Exhs. 3-a thru 3-f, 5-a, 5-d.*

When the property went under contract, the victims were far overseas.   Ms. Zorina was in Moscow, while Mr. Stadnikov was traveling between Nepal and Moscow.   Also, travel restrictions still in place because of the COVID pandemic limited the ability of Mr. Stadnikov and Ms. Zorina to travel to the United States.   Out of necessity, the victims assigned to the defendant the ability to execute on their behalf all documents needed to carry out the transaction.   *See* ECF 140, pp. 134-42, 185-86; ECF 141, pp. 80-81; *Gov't Exhs. 21-c thru 22-c, 34.*

One such document contained instructions to the closing agent as to where to wire the sellers' net proceeds.   On that document, the defendant directed the closing agent to wire the funds, which in this case amounted to slightly less than $3.9 million, to a Citibank account the defendant had used as part of his property manager function to pay the various bills and expenses for Unit 502S.   Both the defendant and Ms. Zorina had signature authority over that account. Prior to the closing, Mr. Stadnikov had instructed the defendant – following the completion of the

transaction – to wire the funds to a bank account the victims maintained in Switzerland.   *See* ECF 139, pp. 108-09, 126-27, ECF 141, pp. 71-72, 81-82; *Gov't Exhs. 1-a, 1-c, 11-b*.

### B. *Defendant's Financial Predicament Coinciding with Closing of Sale of Unit 502S*

#### 1. Defendant Incurs Steep Losses in Options Trading in Volatility Index

The month before St. Regis Unit 502S went under contract, the defendant started investing money through accounts he maintained at Robinhood and Fidelity Investments in purchasing options, largely in what is known as the volatility index, which measures turbulence in the stock market.   Because options generally expire within a fixed time, such as a matter of weeks or months, options trading in the volatility index is a very high-risk strategy.   *See* ECF 140, pp. 82-91; ECF 141, pp. 33-41; *Gov't Exhs. 47, 50, 51-a.*

Initially, the value of the defendant's portfolios in both accounts rocketed sharply upwards. By the end of January, the defendant's net investment of $102,000 that month in his Robinhood account had almost tripled in value.   Similarly, on January 29, the defendant directed approximately $110,000 in his Fidelity account into options trading on the volatility index. Within two days later, the value of those options had climbed approximately 74%.   *See* ECF 140, pp. 76-77; *Gov't Exhs. 46-b, 50, 51-a*.

The next month, however, the defendant's investment fortunes started to plunge steeply in the other direction.   By the end of February, the value of the defendant's Robinhood account had nosedived over 94% down to $13,033.84.   While not cratering as violently as that account, the defendant's Fidelity account tumbled over 50% over the course of the month, with a month-end value of $345.478.60.   *See* ECF 140, pp. 77-78; *Gov't Exhs. 46-c, 50, 51-a*.

### 2.     Defendant's Credit Card Debt

On the day that the sale of St. Regis Unit 502S closed – March 10, 2021 – the defendant faced over $77,570.18 in cumulative credit card debt from six different credit card accounts.   Over the five days that followed, this amount continued to tick upwards.   By day's end on March 15, 2021, the defendant owed $78,956.30.   *See* ECF 141, pp. 41-42, 52-54; *Gov't Exh. 52-a*.

### C.     *Defendant Urges One Sotheby's Personnel to Expedite Transfer of $80,010 Commission*

During the latter part of 2018, the defendant joined brokerage One Sotheby's International Realty as a realtor associate, a relationship that continued through mid-2021.   Through this arrangement, One Sotheby's served as the listing brokerage for the properties the defendant contracted to sell for his clients.   This included St. Regis Unit 502S.   *See* ECF 139, pp. 38-49; *Gov't Exhs. 2-a thru 3-f*.

When a real estate transaction the defendant conducted closed – such as the one for St. Regis Unit 502S – One Sotheby's was the party contractually owed the commission.   One Sotheby's generally would retain approximately 20% of the commission, with the defendant then entitled to the remainder.   For the sale of St. Regis Unit 502S, the commission due to One Sotheby's was $101,000.   From that sum, One Sotheby's in turn owed the defendant $80,010. *See* ECF 139, pp. 53-57, 82-84; *Gov't Exhs. 5-d, 7-a-1 thru 7-m*.

As noted a few paragraphs earlier, the date of the closing on St. Regis Unit 502S coincided with the defendant finding himself in the midst of a financial squeeze.   In response, over the five days between March 10 and March 15, the defendant first encouraged and then urged the Sotheby's commission coordinators to forward his $80,010 commission.

The defendant's initial outreach, which occurred in the late afternoon of March 10, was relatively gentle.   "Can you please deposit my EFT [i.e., electronic funds transfer] into my

account asap??"   The next day, which was a Thursday, found the defendant prodding a bit harder. "[S]orry to be a nudge. Please let me know you got the wire and initiated my EFT.   I am trying to get this money in my account before Friday. thx!"   *See* ECF 139, pp. 67-71, 73-75; *Gov't Exhs. 6-d, 6-e, 6-h.*

On the morning of Monday, March 15, with the transfer yet to land in his account, the defendant's plea took on greater desperation.   In an email with the one-word subject line of "Help," the defendant implored, "It's been 4 days and still I have not received the $80,000 commission.   Can you PLEASE PLEASE check to make sure the EFT was inputted correctly.   I really need that money asap."   *See* ECF 139, pp. 76-77; *Gov't Exh. 6-i* .

D.    **Defendant Steals Over $3.7 Million from the Victims . . . and then, in a Failed Effort to Recoup his Losses . . . Plows the Stolen Money into More Options Trading in the Volatility Index**

After receiving his commission on March 15, later that same day the defendant targeted $75,000 into his Fidelity account.   The next day, March 16, he directed $6,500 towards his unpaid credit card balance.   However, by the end of the day, the defendant was left with only $548.48 in the account he had been using to pay his credit card expenses.   *See* ECF 141, pp. 41-42, 52-55; *Gov't Exhs. 1-b, 46-d, 50, 52-a.*

On the morning of March 17, the defendant set out to tackle his financial predicament with a far more potent weapon.   Exploiting his access to the account holding the victims' proceeds from the sale a week earlier of St. Regis Unit 502S, the defendant drove to a local Citibank branch on Miami Beach and placed an order to have $3,734,277.21 transferred into his personal account at Wells Fargo.   *See* ECF 139, pp. 121-37; *Gov't Exhs. 1-a thru 1-e, 12 thru, 14.*

After the transfer landed, the defendant then proceeded to pour the money he had stolen from the victims into his Fidelity account for yet more options trading in the volatility index, in

the hope of reversing the substantial losses he had sustained.  But history continued to repeat itself, and the account's value continued its downward spiral.  *See* ECF 140, pp. 56-75; *Gov't Exhs. 1-b, 46-d thru 46-g, 47, 50.*

### E.      *Defendant Covers Up his Crime by Lying Repeatedly to Mr. Stadnikov*

As mentioned earlier, the money the defendant had plundered from the victims was money Mr. Stadnikov had instructed the defendant to wire to their account in Switzerland.  Over the weeks that followed, as Mr. Stadnikov periodically inquired as to the status of the transfer, the defendant ginned up one lie after another to steer Mr. Stadnikov off course.

First, the defendant blamed Citibank's alleged need for disclosure of the source of the funds to be transferred.   Next, the problem was Citibank's alleged need to have documents notarized . . . and, then next, Citibank's alleged need to have the documents interpreted . . . and, still next, the alleged need to have the interpreter licensed and registered with the government. . . . Then, it was, "[l]et me go to the post office" . . . followed later by a claimed need for an Apostille.  *See* ECF 141, pp. 82-94; *Gov't Exhs. 53-a, 53-b, 56-a, 56-b, 57-a, 57-b, 60-a, 60-b.*

As March became April, then became May, and then reached the end of May, the defendant left Mr. Stadnikov to believe that his money was sitting securely in the Citibank account, rather than rapidly swirling down a financial drain.   Of course, the defendant did not fess up to what he done until after all the money had vanished.  *See* ECF 141, pp. 94-105; *Gov't Exhs. 62-a thru 63-b.*  When Mr. Stadnikov confronted the defendant for losing all of his and his wife's money in less than three months, the defendant admitted, "[G]reed and self-confidence defeated me."  *See Gov't Exh. 63-a.*  Although the defendant promised to repay Mr. Stadnikov, Mr. Standniov has received "[n]ot a cent."  *See* ECF 140, p. 101; *Gov't Exh. 63-a.*

**F.**      ***Defendant Obstructs Justice by Lying Multiple Times During Court-Ordered Psychological Examination***

As the Court likely recalls, following the return of the indictment, the defense hired Dr. Mark Mills to evaluate him.   In his report, Dr. Mills opined that the defendant suffered from a Bipolar I disorder that resulted in him being in a manic and psychotic state at the time of the offense.   Dr. Mills further opined in his report that, because of the alleged conditions and disorder, the defendant was insane at the time of the offense, as he did not understand the wrongfulness of his misconduct.   *See* ECF 154-2.

Following the defendant's filing of a notice pursuant to Fed. R. Crim. P. 12.2 of intent to rely on a defense of insanity, s*ee* ECF 15, the government filed an agreed motion pursuant to 18 U.S.C. § 4242 and Fed. R. Crim. P. 12.2 for examination of the defendant to determine if the defendant was insane at the time of the offense, *see* ECF 21.   The Court granted the motion.   *See* ECF 22.   Dr. Robert Cochrane conducted the court-order examination, which included interviewing the defendant.   *See* ECF 142, p. 35; ECF 154-1.

In ECF 155, the government set forth the facts demonstrating that the defendant lied multiple times during Dr. Cochrane's interview of him and asserted that the defendant merited a two-level upward adjustment in his advisory guideline level for obstruction of justice.   In that submission, the government set out four specific false statements.   *See* ECF 155, pp, 4-7.

In his response, the defendant tried to minimize the significance of those statements.   The defendant contended that the "[t]he statements were colloquial expressions, not material statements of fact" and were "subjective statements [that] merely reflected Mr. Klioner's own assessment of his state of mind at the time of the offense."   *See* ECF 155, p. 10.

The government has appended to this submission as Exhibits 1 thru 4 transcripts that provide more complete and fulsome renditions of the statements at issue.   Each exhibit

corresponds to the statements in ECF 155, in the order they are set out in ECF 155.   The individual exhibits provide added context surrounding the statements at issue.   As demonstrated in the respective exhibits, in the discussion leading up to each false statement the defendant takes great care to relate specific facts to exculpate himself, but – when asked about the events at issue in this case – feigns lack of memory and suggests that he essentially has blacked out in regard to those events.

Review of the exhibits illustrate that the defendant in fact did purposefully lie and, thus, obstruct justice.   The government also has prepared clips of recordings corresponding to each exhibit and will be prepared to play them as necessary to assist the Court.

## II.      SENTENCING GUIDELINES AND OUTSTANDING GUIDELINE ISSUES

### A.      *Agreed Guideline Recommendations*

As to the advisory Sentencing Guidelines, the Probation Officer has made the recommendations set forth below.

- U.S.S.G. § 2B1.1(a)(1) – Base Offense Level                **7**
- U.S.S.G. § 2B1.1(b)(1)(J) – Loss Greater Than            **+18**
  $3,500,000 But Less Than $9,500,000
- U.S.S.G. § 3B1.3 – Base Offense Level                       **+2**
- U.S.S.G. §§ 4C1.1(a) & (b) – Zero Point                      **-2**
  Offender
- Total Offense Level                                                        **25**
- Criminal History Category I

Neither party has objected to these recommendations.

### B.      *Guideline Issues Pending Resolution by the Court*

In his objections, the defendant contends he merits a two-level downward adjustment pursuant to U.S.S.G. § 3E1.1(a) for acceptance of responsibility.  *See* ECF 154, pp. 1-9.  In its response to the defendant's objections, the government set out grounds in opposition to this request.  *See* ECF 160, pp. 1-11.

The government has filed a single objection in which it contends the defendant merits a two-level upward adjustment pursuant to U.S.S.G. § 3C1.1 for obstruction of justice by lying during his Court-ordered psychological evaluation by Dr. Cochrane.  *See* ECF 155.  The defendant has filed a response in opposition.  *See* ECF 158.

Depending upon how the Court resolves these issues, the defendant's total offense level will be either 23, 25, or 27.  At a Criminal History Category of I, his resulting advisory sentencing range will be either 46-57 months, 57-71 months, or 70-87 months.

### III.      RELEVANT FACTORS UNDER 18 U.S.C. § 3553(a) AND OTHER MATTERS PERTINENT TO DETERMINATION OF THE APPROPRIATE SENTENCE

The Probation Office has not identified any factors that may warrant a sentence outside of the advisory guideline range.  *See* ECF 165 ¶ 106.  The government agrees.

In the government's view, the portions of § 3553(a) most significant in addressing the question whether the Court should follow the Probation Office's position are **(1)** "the nature and characteristics of the offense," *see* 18 U.S.C. § 3553(a)(1), and **(2)** "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the rule of law, and to provide just punishment for the offense," *id.* § 3553(a)(2)(A).

The defendant pilfered $3.7 million from the victims.  He did so by abusing the trust that they had placed in him.  He then exploited the victims' trust by lying repeatedly to cover-up what

he had done and, in so doing, impeded the victims from taking measures to protect their money while the defendant still retained control of some it and before he had squandered the remainder. The defendant's abuse of trust was particularly egregious in that he took advantage of the pandemic travel restrictions that hindered the victims from traveling to the United States and left them even more dependent upon the defendant's good faith and honesty.

Once the defendant was caught, he then obstructed the judicial process by lying multiple times during the court-ordered mental health evaluation.   While the defendant of course has a right to a defense, he does not have a right to generate false evidence.   Such conduct demonstrates disrespect for the rule of law that the Court should account for in the sentence it imposes.

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By:     /s/ Michael S. Davis
        MICHAEL S. DAVIS
        ASSISTANT U.S. ATTORNEY
        FL BAR # 972274
        99 N.E. 4th Street
        Miami, Florida 33132
        (305) 961-9027 (phone); (305) 530-6168 (fax)
        E-mail: Michael.Davis2@usdoj.gov

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I electronically filed a copy of this document with the Clerk using CM/ECF.

/s/ Michael S. Davis
MICHAEL S. DAVIS
ASSISTANT UNITED STATES ATTORNEY