**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 23-cr-20335-RAR**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

GLEB KLIONER,

        Defendant.

_____/

**KLIONER'S SENTENCING MEMORANDUM AND**
**MOTION FOR VARIANCE**

Gleb Klioner ("Gleb") respectfully submits this memorandum to seek the Court's mercy and leniency at sentencing. For the reasons stated below, Gleb requests that this Court grant a variance and impose a sentence of time served with mental health treatment and rehabilitation as conditions of supervised release.

Gleb Klioner, a married father of five and a devout member of the Jewish community in Miami Beach, Florida, was a successful real estate broker until March 17, 2021, when he unlawfully wired $3,734,277.21 owed to his friends and clients, Kirill Stadnikov and Tatiana Zorina, into his personal bank account. He did not use the money to pay off his debts, fund a lavish lifestyle, or flee to a Caribbean island. Instead, Gleb invested every penny of the stolen money, together with his family's

1

entire life savings, in a high-volatility fund known as the Ultra VIX Short-Term Futures ETF ("UVXY")— and lost it all.

Gleb's erratic and criminal behavior occurred during a severe manic episode caused by his then-undiagnosed bipolar I disorder. This devastating mental illness impaired Gleb's judgment and caused him to act irrationally and compulsively. Gleb was driven by a delusion that a global collapse of the financial markets and the banking system was imminent, and that he had to save the Jewish people from an impending pogrom. Two well-respected and highly credentialed psychiatric experts, including the psychologist retained by the government, agreed that Mr. Klioner was psychotic at the time of the offense and "could not appreciate [that] his acts were wrong." *See* August 13, 2024 Report of Government Expert Dr. Robert Cochrane, Psy. D., at DE#154-1, and January 2, 2024 Report of Defense Expert Dr. Mark J. Mills, JD, MD, at DE#154-2. Before law enforcement became involved, and before he was ever charged with a crime, Mr. Klioner admitted to Mr. Stadnikov what he had done.

## I.     The Court Should Impose a Sentence of Time Served.

As the Court is aware, the Sentencing Guidelines serve only as an initial benchmark and must be considered in conjunction with multiple other factors in fashioning an appropriate sentence. *Gall v. United States*, 552 U.S. 38, 49-50 (2007). The federal sentencing tradition is for the Court to consider each defendant

individually and each case as a "unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment." *Pepper v. United States*, 562 U.S. 476, 487 (2011). In reaching an individualized sentencing decision, the Supreme Court's overarching instruction is that the Court "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing set forth in 18 U.S.C. § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). Thus, although Gleb's advisory Guidelines range is 46 to 57 months, the Court can impose a lower sentence that reflects both the whole person before it and the unique circumstances of this case.

Undersigned has been working alongside the Aleph Institute, a non-profit organization dedicated to rehabilitation and recidivism reduction, to curate a proposed sentence of time served combined with hospitalization, mental health treatment, and home confinement. Such a sentence would allow the Court to achieve all of the goals of sentencing, including just punishment, deterrence, and protection of the public, while ensuring that Gleb receives the medical care and treatment necessary for his rehabilitation. Dr. Andrew Spaedy, a psychiatrist in Boca Raton, Florida, has reviewed Gleb's medical records and will address the Court at the sentencing hearing about a proposed treatment plan designed to support Gleb's recovery and help him safely and meaningfully reintegrate into society.

## II.      The History and Characteristics of Gleb Klioner.

### A.  Gleb's Early Life

Gleb Klioner was born in St. Petersburg, Russia in 1971, when Russia was still under communist rule. His father, Zakhary, worked as a foreman at a diesel-engine factory, and his mother, Marta, a trained pianist, played piano at a puppet theatre. Gleb was fortunate to be born into a middle-class family, and grew up in a small apartment. His father was Jewish and his mother had some Jewish ancestry neither were religious, as was common in the Soviet Union at that time.[1] Jewish people faced frequent discrimination, and Gleb's father could not advance at the factory because of his Jewish ethnicity.

In the 1970s, under some pressure from the United States, the Soviet Union lifted its ban on Jewish emigration and began allowing Russian Jews to leave for Israel and the United States of America.[2] In 1979, a family friend persuaded the Klioners to take advantage of this and immigrate to America, where they hoped to face less discrimination and more opportunities. To leave Russia, the family needed a letter from Gleb's paternal grandmother. Although signing the letter jeopardized

---

[1] Under strict Jewish law, Gleb was not born Jewish because his father was Jewish but his mother was not, as only her father was Jewish. In Russia however, there was discrimination against all citizens with Jewish heritage, whether their heritage was maternal or paternal.

[2] *See* https://www.nytimes.com/1979/04/04/archives/emigration-of-soviet-jews-in-march-sets-record-gesture-to-us-seen.html.

her own standing in the Communist Party, she agreed to do so to help her son and his family emigrate.

The Klioners left the Soviet Union that year and traveled to America to start a new life. The international move proved very challenging. With the help of a great-uncle, who gave the family his old Cadillac, they were able to settle in Miami Beach and eventually move into a small, one-bedroom apartment in South Beach.

Gleb's mother began giving piano lessons to children in the Jewish community. She was very personable and well-liked, but Gleb's father struggled to adjust to life in America. In the Soviet Union, paranoia was common, fueled by the constant fear that neighbors were spying on one another or informing on citizens to the government. Even after living in America, Gleb's father remained paranoid, convinced that someone was listening to his phone calls and watching him. Gleb's father also carried guilt for leaving his mother in the Soviet Union to care for his brother, Gleb's uncle, who suffered from severe schizophrenia and eventually required institutional care. Gleb's father had difficulty maintaining a job, and Gleb's parents divorced a few years after moving to Miami Beach, when Gleb was around 13 years old.

Gleb, however, excelled in America. He enrolled in public school in Miami Beach and had to learn English, much of which he picked up from watching cartoons after school. His mother encouraged him to take honors classes and pushed him

academically, motivating Gleb to succeed. In ninth grade, one of Gleb's teachers encouraged him to join the school's chess club. Chess would change Gleb's life: he practiced for three hours every day and went on to win the Florida High School Chess Championship at 16. This achievement helped Gleb gain admission to Carnegie Mellon University, a prestigious university in Pittsburgh, Pennsylvania, where he majored in business.

### B.  Move to Los Angeles and Gleb's First Battle with Mental Illness

During college, Gleb fell in love with the arts. It was the early 1990s, when stand-up comedy was all the rage. Gleb became the "Chairman of the Activities Board" for comedy at Carnegie Mellon. In that role, he booked comedians to perform on campus and even tried performing some stand-up himself. After graduation, Gleb moved to Los Angeles to pursue a career as a talent agent in the entertainment industry.

At first, Gleb found success. He began in the mail room at United Talent Agency ("UTA") and was quickly promoted to assistant. After four years, he was promoted again, this time to the position of agent. Gleb thrived at UTA for seven years, helping several well-known actors and actresses like Vin Diesel and Charlize Theron secure their first starring roles. Around 2000, however, Gleb began to suffer from depression, which began to affect his work at the agency. Ultimately, Gleb's contract was not renewed. Gleb was crushed by his firing, and his depression

worsened. In 2002, he began seeing a therapist, Dr. Smythyman, and tried anti-depressants, though he did not remain on them. Gleb struggled professionally in Los Angeles for several years until his depression became so severe that he could not bring himself to get out of bed for two months.

In 2003, Gleb's mother traveled to Los Angeles to pack his belongings and bring him home to Miami Beach. Gleb moved in with his mother and slowly worked his way out of depression. That same year, Gleb's mother took him to see a psychiatrist, Dr. Milana Kaplan, who treated Gleb for anxiety and major depressive disorder. Slowly, Gleb recovered and went on to earn his real estate license.

No longer in the throes of a depressive episode, Gleb excelled in his new profession. His mother worked as a tour guide for Russian families looking to purchase property in Miami, and she referred many of them to Gleb, who could communicate with them in Russian. Between 2004 and 2021, Gleb became an extremely successful real estate broker, working at several real estate firms before joining Sotheby's in 2018. In addition to representing high profile and loyal clients like the CEO of Estee Lauder, Gleb sometimes helped friends and community members with real estate transactions when they needed assistance or simply guidance. One dear friend of Gleb's, Gilad Weic, recalls that in 2018, when he was struggling financially to buy a home for his family, Gleb stepped in to help:

> What he did went far beyond anything a client could reasonably expect.
> He spent countless hours guiding us through the process — evaluating

properties, negotiating on our behalf, explaining paperwork, and patiently answering the same questions more than once because he understood how stressful the situation was for us. He never asked for anything in return, and he never treated our family as anything less than a priority.

What I will never forget is what he did at closing. Gleb took the commission he was entitled to receive from the other side of the transaction and applied it directly toward our down payment. He did not announce it, did not make a show of it, and did not want thanks. He did it because he saw a family that needed help and he had the means to provide it. Because of Gleb, my wife and children have a home. That is not an exaggeration and it is not a figure of speech. Without his generosity, we would not have been able to close on the house. I have thought about that gesture many times over the years, and it tells you everything you need to know about the kind of person Gleb is when no one is watching.

*See* Letter of Gilad Weic. [3]

### C.  Return to Judaism

Although Gleb had recovered and found professional success, he continued to feel untethered and lost in his personal life, until a chance encounter changed his life. Gleb was representing a Jewish client from England who was having difficulty finding a suitable home in South Florida. The client, who was observant, invited Gleb to attend Sabbath services with him at a synagogue in Bal Harbour. At the synagogue, Gleb ran into Harold Rosenstein, an old family friend and the father of one of Gleb's high school friends, whom Gleb had not seen in twenty years. Harold, who was then 70, shared with Gleb that he had reconnected with Judaism and had

---

[3] The letters in support of Gleb are attached as **Composite Exhibit 1**.

his bar mitzvah at the age of 63. Harold observed the Sabbath, kept kosher, and put tefillin on every day. [4] He felt that his embrace of orthodox Judaism repaired his relationship with his children and brought many other blessings into his life. A week later, Harold invited Gleb to return to the temple for Sabbath and encouraged him to attend regularly.

This encounter changed Gleb's life. He recalls that at that point, after returning from Los Angeles, he was spiritually "at rock bottom." As an only child raised in an atheist country, he felt a powerful pull toward the Jewish community. Gleb made the decision to convert to Judaism. Although Gleb's family was not religious, he felt that converting was a wonderful and meaningful way to reconnect with his Jewish roots and, in some sense, with his father. He was especially inspired by the large, happy families he encountered at Chabad. Gleb was searching for a way to refocus, build a more positive and grounded life, and to connect with God. His conversion took almost three years, and in 2008, he became Jewish.

### D.  A Whirlwind Romance and Starting a Family

On a Friday afternoon in 2011, after using the Jewish matchmaking website SawYouatSinai.com, Gleb received what may have been the most important phone call of his life. A young woman named Ashley Carlson had seen Gleb's profile and

---

[4] *Tefillin* are a set of small black leather boxes with straps containing prayers. In Judaism, they serve to re-align one's heart and mind with God, decency, and justice.

wanted to meet him. Gleb called her before Shabbat and they made plans to have dinner on Saturday night. They enjoyed each other's company so much that they met again the next day, spending Sunday walking along the Hollywood boardwalk. On Tuesday, Gleb brought Ashley to his mother's birthday dinner and on Wednesday, Ashley brought Gleb to her own mother's birthday dinner. That night, only five days after they met, Gleb proposed. They married a few months later, on June 19, 2011. Ashley recalls the moment she knew she was marrying the right man in her touching letter describing Gleb's presence in her and her children's lives:

> On the day of our wedding, there was an older couple from his community who meant a lot to him, and he really wanted them to be part of our special day. They had no way of getting to the wedding. Despite the fact that it was raining and he needed to get to the ceremony, he stopped to pick them up. The man was unable to walk, so Gleb carried him into the car and helped his wife as well. He was already wearing the suit he was getting married in. This made him late to his own wedding. He was always going out of his way to make other people happy. After hearing about this incident and why he was late, I knew I was marrying the right man.[5]

Over the years, Gleb and Ashley have overcome many adversities together as a loving couple. During their honeymoon in Italy, while pregnant with their first child, Ashley suffered a miscarriage. She recalls that Gleb was very supportive, ensuring she received the necessary medical care and comforting her through a very

---

[5] Letter of Ashley Klioner.

10

difficult time. In 2020, Gleb's mother, Marta, started showing signs of dementia. Ashley and Gleb

> moved her into our home so we could help care for her and keep an eye on her. Gleb took on much of that responsibility, since I was busy with our four children. He made sure she had all her meals, took her medication, and as her condition worsened, he even helped bathe her. He balanced working, being there for me and the children, and making sure his mother was loved and cared for.[6]

Soon, Marta's condition worsened, and she needed full-time professional care. Sadly, Marta passed away in February 2026, while Gleb was incarcerated, and he was unable to attend her funeral.

Gleb and Ashley have been together for almost 15 years. They have five children: Bentzi, 13; Alexander, 12; Miriam, 10; Mendel, 7; and Betzalel, 5. Gleb's oldest children have written letters to the Court in support of their dad. Ashley teaches math and science at the Jewish school in their community, where all five children attend.

---

[6] Letter of Ashley Klioner.

Below is a photograph of Gleb with his family at Bentzi's Bar Mitzvah:



Unfortunately, Gleb's youngest son, Betzalel, has been struggling both at school and at home, and was recently diagnosed with autism. Ashley has had to face this diagnosis without Gleb by her side, and is now caring for all five children on her own. Needless to say, Gleb's incarceration has caused enormous hardship and turmoil for Ashley and her five young children.

In Gleb's absence, the Jewish community has rallied around Ashley and the kids, offering unconditional support, including meals and help with childcare. Eli

12

Schachter, Gleb's friend of 15 years and a local chocolatier in Miami Beach, sends Ashley and the children a chocolate care package every Friday before Shabbat. Eli, along with many of Gleb's friends and fellow congregants from the Bais Menachem Congregation in Miami Beach, have written moving letters about Gleb's presence in their lives, and Gleb's devotion to his family and community.

Shmuel Zalmanov, a friend of Gleb's, writes:

As a father, Gleb is deeply devoted to his wife Ashley and their five children. I have personally witnessed the care and intentionality he brings to his role as a parent. He regularly sought out meaningful activities to share with his children on weekends — trips to water parks, local parks, and family outings — and organized play dates with great enthusiasm. He would return from these adventures beaming with pride, eager to share the short films he had lovingly put together of his family's outings — a reflection of both his background in film production and the deep joy he takes in being a father. His children are fortunate to have a father who not only loves them deeply, but actively cherishes and documents every moment with them.[7]

Yosef Shabtay, another friend and member of Bais Menachem, shares a similar sentiment:

What I can say with confidence is this: whatever his struggles, Gleb Klioner is a devoted and loving father. At every community gathering — the barbecues, the holiday celebrations, the Shabbat meals — Gleb was present, and he was present for his children. I watched him shepherd his kids through crowded events with patience and care, making sure they were fed, engaged, and safe. I watched him sit beside them in synagogue, reading together from the siddur, his attention fixed on them with the quiet pride and tenderness that only a father who truly cherishes his children can convey. Whatever may be said about his

---

[7] Letter of Shmuel Zalmanov.

judgment, his love for his five children has never wavered, and that is a truth I have witnessed firsthand.[8]

## E.  Gleb's Battle with Mental Illness

As the Court heard during trial, Gleb experienced a second significant mental health episode beginning in late 2020. Ashley recalls that Gleb:

> was not sleeping and was up all night looking at stocks and the news. He believed the economy was going to collapse and that Jewish people were in serious danger. He constantly called people trying to warn them.

> I remember one night he went out and bought phones with prepaid minutes and was posting in WhatsApp groups warning that Jewish people were in danger. He was so paranoid about being traced that he threw the phone away before coming home. He was out all night, and I did not know where he was. It was a very scary time.

> He also took extreme steps in our home because of these fears. He put locks and chains on our doors, boarded up some windows, and even created a type of panic room using shutters that could be locked from the inside because he believed he was protecting us.[9]

Members of the Klioners' community also noticed the severe change in Gleb's behavior. Shmuelie Shmotkin, the Gabbai of Gleb's synagogue, recalls how different Gleb seemed after returning to the synagogue after the COVID-19 pandemic:

> When [Gleb] started coming back around, something was clearly different. The reserved, low-key person I had known for years was now agitated and consumed with a sense of urgency that I had never seen in him before. He made several very impassioned requests to speak from the pulpit—to warn the congregation about dangers he believed were

---

[8] Letter of Yosef Shabtay.
[9] Letter of Ashley Klioner.

14

coming. Dangers in the financial markets, dangers to the Jewish community specifically, a broader unraveling of society. This was not the Gleb any of us knew.

He would walk home with me after services, hold on to my ear for long stretches, trying to convince me—and anyone who would listen—to invest in financial instruments that were essentially bets against catastrophic collapse. He was relentless about it. The intensity just kept building. It was clear to me and to others in our community that something very serious was going on with him. We were all worried. And we felt deeply for Ashley and the kids, who are among the sweetest, most gentle people you could ever meet, and who were living through this alongside him.[10]

In February 2021, Gleb addressed the congregation of his synagogue during services and descended into a rant about what he described as an existential threat to Jews in the United States. His behavior alarmed many of the congregants and culminated in another member of the synagogue, Dr. Roy Weiss, attempting to "Baker Act" Gleb that same month. Dr. Weiss completed a Certificate of Professional Initiating Involuntary Examination, to be submitted to Jackson. *See* DE#158-2. In the certificate, Dr. Weiss noted that Gleb appeared to be suffering from "paranoid hallucinations" and mania. *Id*.

At first, Ashley felt relieved that others in the community recognized the severity of Gleb's mental state. But as the reality of the situation set in, she became frightened and begged not to have Gleb institutionalized:

Gleb was the only one working and providing for our family. I did not know how I would manage five young children and his mother on my

---

[10] Letter of Shmuelie Shmotkin.

own. I was also afraid to disrupt our marriage. I made the decision to tell them not to come. Looking back, that was a mistake.[11]

Only a few weeks later, he committed the instant offense.

Gleb's mania subsided a few months later. As is often the case after a manic episode, Gleb fell into a deep depression around August 2021. This prompted him to receive psychiatric treatment. Gleb's medical records from this time have been filed for the Court's review at DE#162.

After receiving treatment and medication in late 2021, Gleb's behavior slowly returned to normal. Dr. Amiel Levin, a friend of Gleb's for more than 15 years, hired him to work as an assistant in Dr. Levin's medical office after Gleb lost his job, and noticed significant improvement in his behavior:

> I knew Gleb during the period when he became unwell, and I personally observed the severe change in his thinking and behavior during that time. What I witnessed was not consistent with the stable and capable person I had known before. His behavior was clearly abnormal, disturbing, and deeply concerning. In the years that followed, I also observed that he sought care from psychiatrists and other physicians and remained engaged in treatment. With time, medical supervision, and appropriate medication, I saw substantial stabilization and improvement.
>
> Because I knew his history directly, and because I had the opportunity to observe his condition over time, I felt I could make a careful and informed judgment about whether he could safely return to productive work. I decided to employ him in my office as part of what I viewed as a genuine opportunity for rehabilitation. He then worked with me for approximately a year and a half.

---

[11] Letter of Ashley Klioner.

During that period, Gleb demonstrated that, when properly treated and medically supervised, he was able to function responsibly and meaningfully in society. He was generally on time, behaved appropriately in the workplace, and was able to carry out substantial responsibilities. He interacted appropriately with approximately seven to eight other team members and was able to collaborate in a real work environment. He built three websites for my work, managed email systems, helped supervise employees remotely, and contributed significant technological improvements to the office, including helping us advance our use of artificial intelligence and digital systems. He brought intelligence, creativity, and practical value to the workplace.[12]

Gleb continues to receive medication through the BOP, but as Dr. Spaedy will explain to the Court, he would benefit most from a structured treatment plan tailored to his needs.

### III.   The Nature and Circumstances of the Offense.

The Court is familiar with the facts of this case, and the nature and circumstances of the offense are accurately reflected in the PSI Report, subject to the additional context and clarifications set forth in Gleb's Objections to the PSI Report [DE#154].

However, it bears emphasis that Gleb's offense was not motivated by materialism. Contrary to the government's contention, Gleb did not take the money to fund a lavish lifestyle, purchase expensive homes or fancy cars, or otherwise enrich himself. Rather, he was in the midst of a manic episode during which he genuinely believed he could not lose. Gleb was suffering from a severe mental

---

[12] Letter of Dr. Amiel Levin.

disease that profoundly distorted his judgment and perception of reality. He became convinced that the 2020 presidential election would be overturned, that civil war would ensue, and that Jewish people would be massacred. His actions were driven by a delusional objective to raise money to fund and arm a militia to protect those he believed to be in danger.

There are several pieces of evidence that support the contention that Gleb was not in financial distress and his actions were driven instead by mania:

- The first half of 2021 was one of Gleb's strongest periods as a realtor since 2019. His 2021 sales exceeded the combined totals for 2019 and 2020.

- On January 29, 2021, Gleb made a $162,000 one-day net profit from the Ultra VIX Short-Term Futures ETF ("UVXY"). He immediately reinvested those gains into additional volatility positions rather than paying off his credit card debts.

-  On February 3, 2021, Gleb donated $50,000 for a 30-minute telephonic meeting with a rabbi's son, during which he attempted to persuade him that a pogrom was imminent.

- On February 17, 2021, Gleb canceled the contract for the purchase of a new family home, but allowed the seller to keep the $25,000 *refundable* security deposit "because he felt bad for wasting the seller's time." *See* DE #140:196.

This is not a typical fraud case in which the defendant used the stolen funds for material gain. Gleb's "zero-chance" certainty in investing, betting everything, including the victims' money and his own family's life savings, was, according to the government's own expert, Dr. Cochrane, "classic manic bipolar behavior." DE#142:55. Dr. Cochrane further acknowledged at trial that, "it's quite common, in

18

fact, for the individual to have grandiose ideas, you know, inflated self-esteem to the point they become delusional. They're not based in reality. They're beliefs about things that are false." DE#142:47.

### IV. A Sentence of Time Served Would Sufficiently Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment.

The seriousness of the offense, the need to promote respect for the law, and the goals of just punishment and deterrence do not require a substantial prison / custodial sentence in this case. Indeed, as discussed below, many courts have found that a sentence of house arrest or probation is sufficient punishment to deter future bad acts. *See Gall v. United States*, 552 U.S. 38, 44 (2007) (recognizing that "probation, rather than 'an act of leniency,' is a 'substantial restriction of freedom;'") (quoting district judge); *id*. at 48 (affirming that "[o]ffenders on probation are . . . subject to several standard conditions that substantially restrict their liberty"). Here, time served (more than five months) is adequate.

As described earlier in Section II, Gleb did not wire the proceeds to himself for personal gain, nor did he use the funds to purchase luxury items or to support a lavish lifestyle. His conduct was driven by delusions stemming from his mental disease. He had no nefarious or venal motive in taking the money. He truly believed a crash was imminent and that he was going to short the market and make millions, and would use those millions to defend the Jewish people. Now stably medicated,

Gleb knows that this belief was irrational. A sentence of time served, couple with in-patient treatment and home confinement, will therefore suffice as a life-altering and "just" punishment that accounts for the seriousness of the offense while promoting respect for the law.

That is especially true here, where this is Gleb's first encounter with the criminal justice system. The court in *United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012), approved of the lower court's reasoning that there is inherent punishment for a person who is forced into the criminal justice system for the first time:

> I think it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed.

*Id*. Gleb is now a convicted felon who has forfeited valuable civil rights and lost his job because of his actions. The stress, fear, and shame of being a defendant in a criminal case have had a profound and lasting impact on Gleb. For the rest of his life, he will bear the remorse of having harmed his friends and family. The social stigma of having been convicted and his conviction as a felon will prevent him from ever working again as a real estate broker. And Gleb's conduct and conviction have had emotional and psychological consequences for his five children.

These are factors the Court may consider in determining what constitutes just punishment for Gleb, and for these reasons, a sentence of time served is punishment enough; "there is no justice in imposing a sentence merely to make an example out of a defendant." *United States v. Musgrave*, 647 F. App'x 529, 533 (6th Cir. May 4, 2016) (affirming a sentence of one day imprisonment and two years' home confinement for fraud offenses that resulted in a Guidelines range of 57 to 71 months' imprisonment) (internal quotations omitted).

## V. A Sentence of Time Served Would Afford Adequate Deterrence and Protect the Public.

Gleb does not pose any threat to the public. He is 54 years old, has no criminal history, and is statistically unlikely to recidivate, as recidivism rates decline as age increases. U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate* at p. 12, 28 (May 2004); *see United States v. Nellum*, 2005 WL 300073 * 3 (N.D. Ind. Feb. 3, 2005). A study by the Sentencing Commission showed that for offenders aged 50-59 in Criminal History Category I (like Gleb), the re-arrest rate was only 16.1%. Steven & Easley, *The Effects of Aging on Recidivism Among Federal Offenders,* U.S. SENTENCING COMM'N, at 3, 25 (2017); *see also United States v. Clarke*, 2019 WL 7498752, at *3 (N.D. Fla. Sept. 11, 2019) (recognizing that a 47 year-old defendant was "at an age at which recidivism rates decline substantially").

21

Additionally, Gleb sought treatment after committing the offense and continues to receive medication for his disorder, reducing the risk that he will commit any future offense. Given the suffering Gleb and his family have endured as a result of his actions, including the loss of Gleb's brokerage license, his real estate career, and his family's life savings, as well as his acceptance of responsibility and confession to Mr. Stadnikov, it is highly unlikely that Gleb Klioner will reoffend.

### VI.  The Kinds of Sentences Available.

The offense of conviction does not carry a mandatory sentence, and this Court has broad discretion to impose a sentence that is reasonable. In coordination with the Aleph Institute, we propose a sentence of time served, with mental health treatment and home confinement as conditions of supervised release, which would serve the goals of retribution and deterrence while allowing Gleb to rehabilitate and receive the specialized treatment he needs.

The Aleph Institute was founded in 1981 by Rabbi Sholom Lipskar, who served as the Institute's Chairman until his passing last year. *See* https://aleph-institute.org/wp/. Over the last four decades, the Aleph Institute has worked with the courts and the prison system, helping inmates through the worst time of their lives while also benefiting society at large. In coordination with Aleph, Dr. Andrew Spaedy will address the Court at the upcoming sentencing hearing and present a proposed treatment plan for Gleb.

Courts have accepted Aleph's recommendations and bestowed alternative sentences in similar cases. In *United States v. Halpern*, 21-CR-10144 (D. Mass), Brian Halpern pled guilty to one count of conspiracy to commit mail and wire fraud, two counts of wire fraud, and one count of money laundering for his role in a twenty-year conspiracy to defraud a company of more than $3 million through falsified invoices. Mr. Halpern had a total offense level of 24, with a criminal history category I. Recognizing that Mr. Halpern had experienced an abusive childhood and suffered from a gambling addiction, the Aleph Institute advocated for an alternative sentence to incarceration, emphasizing treatment and community service. The Court, noting that Mr. Halpern had four young daughters to care for, accepted the defense team's recommendation and sentenced Mr. Halpern to one day deemed served, with three years of supervised release and eight months of home confinement. The Court also required him to participate in gambling treatment programs and regular counseling. *See* 21-CR-10144 (D. Mass), DE#35; 32.

VII. **A Sentence of Time Served with Conditions of Release Prioritizing Treatment is Warranted in this Case.**

Prior to the 2025 Amendments to the Sentencing Guidelines, Section 5K2.13 of the Guidelines provided for a downward departure if "(1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense." U.S.S.G. § 5K2.13. In 2025, the Sentencing

Commission removed this provision, eliminating downward departures. In doing so, the Commission noted, "[i]t is the Commission's intent that judges who would have relied upon facts previously identified as a basis for a departure will continue to have the authority to rely upon such facts, or any other relevant factors, to impose a sentence outside of the applicable guideline range as a variance under 18 U.S.C. § 3553(a)." U.S.S.G. Ch. ONE, Pt. A, Refs & Annos.

Such a variance is warranted here. As discussed above, Gleb was suffering from a manic episode that included delusional thoughts in March 2021. Both experts agreed that Gleb's bipolar condition was a major cause of his criminal conduct. See DE#154-1; 154-2. Dr. Cochrane, the government's expert, opined that "for delusional reasons[,] Mr. Klioner believed he was doing the *right* thing. He thought taking the clients' money would lead to incredible profits, benefiting them and helping him raise money to arm and protect others. In fact, in his frenzied drive to save Jews, he saw no other option than to use all funds and means available to him to accomplish this goal." DE#154-1, p. 14. Dr. Cochrane further concluded: "Mr. Klioner was experiencing bipolar disorder, including manic symptoms and delusions, at and around the time of the alleged offense. With the caveats noted above, I believe he was unable to appreciate the quality and wrongfulness of his actions as a result of that condition." *Id*.

24

Dr. Mills came to a similar conclusion: "[F]irst, Mr. Klioner suffers from bipolar I disorder, not diagnosed until after the incident that underlies his prosecution in this matter; second, as a result of that disorder, he was psychotic before, during and after the time when he stole substantial money from the victims in this matter; third, because of his manifest psychosis, Mr. Klioner was insane at the time he stole the money, as he did not understand the wrongfulness of his misconduct; fourth, he is not psychotic now and his affective (emotional) symptoms appear to be in solid control with medication he tolerates well and appreciates taking." DE#154-2, p. 8.

Medical records also corroborate Gleb's condition. In December of 2021, Dr. Samuel Mowerman treated Gleb and diagnosed him with bipolar I disorder. *See* DE#158-1; 162. The BOP's medical records also reflect this diagnosis, and Gleb has been consistently treated with antipsychotics and mood stabilizers since 2021. *Id*.

Although Gleb sincerely regrets his conduct, the significant role his mental illness had in the commission of the offense cannot be overlooked. His education, professional history, devotion to his family, and dedication to the Jewish community all underscore the aberrant nature of his conduct. Bipolar disorder is a destructive mental disease that can afflict any individual at any stage of life. Many courts have recognized this reality and appropriately taken it into account during sentencing.

In *United States v. Stewart*, No. 8:06-cr-00257-JSM-MSS (M.D. Fla. Nov. 20, 2006), Stewart was charged with scheming to defraud a St. Petersburg-based

corporation out of more than $1.7 million. *See id.* at DE#4. The defendant suffered from the same type of bipolar disorder that afflicts Gleb. *Id.*, DE#28. The Court granted a ten-level downward departure due to the defendant's diminished capacity and imposed a sentence of probation. *Id.*, DE#37; *see also United States v. Menyweather*, 447 F.3d 625 (9th Cir. 2006) (affirming an eight-level downward departure based on diminished capacity); *United States v. Follette*, 990 F. Supp. 1172, 1179 (D. Neb. 1998) (granting downward departure where the defendant suffered from bipolar disorder, from a 30-37 month range to 5 years' probation with 6 months home detention); *United States v. Nowicki*, 252 F. Supp. 2d 1242, 1251-55 (D.N.M. 2003) (granting a five-level downward departure and imposing a 15 month sentence where the defendant's bipolar disorder "impaired his ability to understand the wrongfulness of his offense behavior"); *United States v. Scarbrough*, 2004 WL 2247483, at *4 (S.D.N.Y. 2004) (granting four-level departure from 10-16 month range and imposing sentence of one day time-served and three years supervised release where the defendant's judgment was "impaired by his longstanding mood disorder"); *United States v. Risse,* 83 F.3d 212, 217 (8th Cir. 1996) (affirming a 39–month departure where a defendant suffered posttraumatic stress disorder).

Finally, the Court should consider the impact of incarceration on Gleb's five minor children, particularly his youngest child, Betzalel, who was recently

26

diagnosed with autism. Gleb is a loving and involved father, and his incarceration would have a lasting effect on all five children. Gleb is especially needed at home to help care for Betzalel, who requires substantial supervision and care. Betzalel's treating provider has emphasized the importance of stability and routine in caring for Betzalel:

> The clinical literature consistently demonstrates that children with ASD achieve the best outcomes when they are embedded in a stable, predictable, and supportive family environment. The involvement of primary caregivers and parental figures is not merely beneficial — it is a foundational component of ASD treatment and behavioral intervention.

> Betzalel's household currently includes multiple children, placing significant caregiving demands on his mother. The presence of his father, Mr. Gleb Klioner, is a meaningful variable in the stability of this home environment. A consistent, two-parent structure provides the predictability and emotional security that children with ASD require, and any disruption to that structure —particularly an abrupt or prolonged one — carries measurable clinical risk for a child with Betzalel's profile.

***

> His clinical prognosis is most favorable in a stable home environment with intact family support, structured ABA therapy, and appropriate pharmacological management. Any significant disruption to his home structure carries real and measurable risk to his developmental trajectory.[13]

Here, a sentence of time served, coupled with the rehabilitative measures facilitated by Dr. Spaedy and the Aleph Institute, would be "sufficient, but not

---

[13] Letter of Dr. Fernando A. Laracuente, EdD, APRN, FNP-BC, PMHNP-BC.

greater than necessary, to comply with the purposes" of criminal punishment and promote respect for the law. 18 U.S.C. § 3553(a)(2)(A). This sentence would also allow Gleb to receive the care he needs while supporting and caring for his family in a functional, healthy way.

## VIII. The Need to Avoid Unwarranted Disparities in Sentencing.

The goal of avoiding unwarranted sentencing disparities, which was a principal motivating force for the Sentencing Guidelines, remains a key sentencing factor under 18 U.S.C. § 3553(a). *See United States v. Owens*, 464 F.3d 1252, 1255 (11th Cir. 2006). Although no other co-defendants were involved in this offense, courts have sentenced defendants convicted of wire fraud to probation when mitigating factors similar to those in this case were present. For example, in *United States v. Burnell*, 367 F. Supp. 3d 12, 16 (E.D.N.Y. 2019), the defendant was charged with defrauding export companies purchasing scrap metal for shipment to foreign customers by padding the scrap with cheaper metal. The court sentenced Burnell to probation, noting that Burnell was now receiving treatment for his longstanding bipolar disorder; he no longer operated the business involved in the offense; his community was committed to helping him avoid further trouble with the law; he presented a low risk of recidivism; his children required special care; and he was his family's primary breadwinner. *Id*.

28

## IX.    Conclusion

For these reasons, Mr. Klioner respectfully requests that the Court impose a sentence of time served, combined with and home confinement and a robust treatment plan to be facilitated by the Aleph Institute.

DATED: May 11, 2026

Respectfully submitted,

**BLACK SREBNICK**
201 South Biscayne Boulevard
Suite 1300
Miami, Florida 33131
(305) 371-6421

*/s/ Howard Srebnick*
**HOWARD SREBNICK**
Florida Bar No. 919063
HSrebnick@RoyBlack.com

*/s/ Maria Neyra*
**MARIA NEYRA**
Florida Bar No. 74233
MNeyra@RoyBlack.com

*/s/ Alexa Klein*
**ALEXA KLEIN**
Florida Bar No. 1002299
AKlein@RoyBlack.com